IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 6, 2009 Session

## STATE OF TENNESSEE v. DARREN BROWN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08194     Chris Craft, Judge**

**No. W2008-01866-CCA-R3-CD   -   Filed January 5, 2010**

The defendant, Darren Brown, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment. On appeal, he argues that (1) the evidence was insufficient to sustain his conviction; (2) the trial court erred in denying his motion for mistrial in light of the prosecutor's improper closing argument; and (3) the State's comment on the defendant's post-arrest silence constitutes plain error. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR. and CAMILLE R. MCMULLEN, JJ., joined.

Lance R. Chism (on appeal); Juni Ganguli and James Thomas (at trial), Memphis, Tennessee, for the appellant, Darren Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer and Colin Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's killing the victim, Darren Taylor, on April 23, 2006, for which he was indicted on one count of premeditated first degree murder. At the time he was killed, the victim was sitting in a rented Mitsubishi Galant vehicle with his girlfriend outside County Line Grocery in Memphis, Tennessee.

At trial, Dorothy Vester, the victim's mother, testified that the victim's nickname was "Goo-Man." She said that the victim was shot at County Line Grocery on April 23, 2006, and died from his injuries shortly thereafter.

Athelia Frazier[1] testified that she was at County Line Grocery on April 23, 2006, when she observed a two-tone Crowne Victoria circling the block. She also noted a "brownish goldish color car" parked in front of the grocery store. Frazier saw a man, later identified as the defendant, get out of the Crowne Victoria on the side of the liquor store.[2] The defendant walked around the back of the building, reappeared on the side of the grocery store, and approached the brown-gold car. The defendant shot into the car six or seven times, left, and was picked up again by the Crowne Victoria.

Frazier testified that she was putting her daughter in her car, which was parked approximately two spaces away from the brown-gold car, during the incident. She noted that she was close enough to hear voices two cars down, but all she heard was gunfire. She said that there were two people inside the brown-gold car, the victim and a woman. Frazier observed that the woman was scared. Afterward, Frazier left the scene because she was scared but returned fifteen or twenty minutes later.

Frazier testified that upon returning to the scene, she told the police what she had observed and described the gunman as "short, brown skinned, had a low haircut, he had on a hat, some glasses, a white T-shirt and bluejean shorts." Frazier identified the defendant as the gunman out of a photographic array on May 2, 2006. She admitted that she identified someone other than the defendant from a group of individuals at a hearing in July 2006. Frazier explained that she identified the wrong person because "[h]e threw [her] off because he had on glasses, like reading glasses, and he didn't have them on at the time of the murder." Frazier said that she was certain that the defendant was the gunman.

On cross-examination, Frazier stated that there was a car parked between her car and the victim's car. She acknowledged that she was kneeling down when the shooting took place but said that she "could see a lot." However, when asked, "So you really couldn't see what was going on on this side of the car," Frazier responded, "No, sir." Frazier said that after the shooting, before she left the scene the first time, she saw the woman who was in the victim's car drive away from the scene in the victim's car. She also explained that, when she originally left the scene, she went home and talked to her mother and a neighbor and then returned to the scene to talk to the police.

Victoria Williams testified that on April 23, 2006, she had been dating the victim for two or three years. On that date, the victim and Williams went to County Line Grocery to get some snacks before a barbecue that the victim's aunt was preparing was ready. The unarmed victim went inside the store and then returned to the car. The victim and Williams sat in the car talking and laughing, and the victim was preparing a marijuana cigarette. Suddenly, the back passenger's side door opened and the defendant fired several shots inside the car. When she heard the gunshots, Williams "dropped down" to the floor of the car. Williams described the gun as black with "a spin thing on

---

[1] We note that this witness's first name is spelled "Althea" throughout the trial transcript, but her signature on the Advice to Witness Viewing Photographic Display form reflects that her first name is spelled "Athelia."

[2] The record reflects that there is a liquor store two doors down from the grocery store in the same plaza.

it." Before the shooting started, Williams "heard more than one voice" but did not hear the victim say anything.

Williams testified that at some point after the shooting, the victim exited the car and went inside the store. Williams went inside after the victim and found him lying on the floor. After speaking to the victim briefly, Williams left the scene and went to the victim's aunt's house to seek help because she did not realize the severity of the victim's injuries. She denied that she left the scene to dispose of a gun or marijuana. When Williams and the victim's aunt returned to the grocery store, the police were on the scene. She went to the police station and told them that she thought she could identify the gunman. On May 3, 2006, Williams identified the defendant as the gunman from a photographic array. She also identified the defendant from a group of individuals at a hearing in July 2006.

Officer Thomas Ellis with the Memphis Police Department testified that he was working as a detective in the Felony Response Unit in April 2006. Officer Ellis testified that on April 23, 2006, he responded to a call at County Line Grocery to determine if the store had video surveillance of the incident. Officer Ellis was informed that the cameras were not recording that day, and he verified that information.

The parties stipulated that retired policeman, Captain Don Carpenter, would have testified that he processed the 2006 Mitsubishi Galant in this case for latent fingerprints and found no latent prints that matched the defendant, Michael Pressley, or Dorrell Jones.

Officer Marlon Wright with the Memphis Police Department testified that he was working as a crime scene officer on April 23, 2006, and in that capacity responded to the scene in this case. Officer Wright photographed and diagramed the scene as well as inspected the victim's vehicle. Officers discovered blood inside the vehicle but did not find any bullet holes. The officers did not find a firearm inside the vehicle. Officer Wright explained that the difference between a semi-automatic and a revolver is that the casings have to be physically removed from a revolver. The officers did not find any shell casings at the scene. Officer Wright testified that "a .38 or 357" would typically be fired from a revolver.

Dorrell Jones, who was charged with facilitation of the murder in this case, testified that he, the defendant, and Michael Pressley were driving around together on April 23, 2006, in the defendant's Grand Marquis or Crowne Victoria. Jones was driving. As they were driving around, Pressley saw "Goo-Man" in a passing car. Upon mention of "Goo-Man," the defendant became fidgety and "wanted to know who had a weapon so he [could] protect himself because there were . . . threats going through the neighborhood about . . . him and Goo-Man." No one in the car had a weapon, so they drove to get one from "the little guy around the corner." The "little dude" gave Jones a gun wrapped in a towel, which Jones in turn handed to the defendant. After receiving the gun, the defendant was "kind of cool" and "normal."

Jones testified that he then drove himself, the defendant, and Pressley to County Line Grocery to purchase cigars. As they pulled up to the store, they noticed the victim's car parked in front of the store. At that point, the defendant said that "he was going to go talk to him" and exited the car. The defendant had the gun with him, and Jones and Pressley drove off. However, as they were driving up the street, Pressley noticed the defendant running toward them, so they turned around to pick him up. The defendant still had the gun with him and was not injured.

Jones testified that he asked the defendant what had happened, and the defendant said, "[D]on't worry about it . . . just leave." The defendant expressed that he had shot the victim because "he acted like he didn't want to talk and he started reaching for something." The group immediately drove to the defendant's grandmother's home in east Memphis where Jones hid the gun in the backyard. Jones explained that he had to get rid of the gun because of his "legal situation." After he was arrested, Jones led the police to where he had buried the gun, but it was not there.

Jones testified that he later gave two statements to the police, the first on May 3, 2006, and the second on May 4, 2006. He stated that he personally asked to change the first statement because he "felt like it was the right thing to do," and that led to his giving the second statement. He said that the second statement was more truthful and complete than the first statement. Jones stated that he told the police that the defendant had said that the victim was reaching, but he admitted that was not in his second statement. On cross-examination, Jones testified that the defendant told him the victim pulled something and that was why he shot him.

Jones testified that the dispute between the victim and the defendant was over "either dope or money," and the defendant had said that the victim had robbed him before. Jones stated that he had dreadlocks on April 23, 2006, but he could not remember how he had them styled.

Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, testified that she performed the autopsy of the victim and determined the cause of death to be multiple gunshot wounds to the back. Dr. Chancellor found six gunshot wounds on the victim's body caused by four bullets, two of which remained in the body and two that exited the body. One bullet entered from the back of the victim's upper right shoulder and exited on the front of the right shoulder. Another bullet entered the back of the victim's right arm and exited through the inner front part of his arm. One bullet entered the back of the victim's right shoulder, and Dr. Chancellor recovered that bullet from the front of his chest. The fatal bullet entered the right side of the victim's back and damaged his internal organs. That bullet was recovered from the victim's chest wall. Dr. Chancellor testified that the recovered bullets were of a medium caliber consistent with a .38 or .357 caliber projectile. The toxicology report did not reveal the presence of alcohol or narcotics in the victim's blood.

On cross-examination, Dr. Chancellor testified that the victim's blood tested positive for the breakdown product of marijuana, which indicated he had used marijuana in the past two or three weeks. She said that his blood also tested positive for atropine, which is a substance used to resuscitate the human body.

Sergeant Elaine Shelby with the Shelby County Sheriff's Office testified that she was assigned as an investigator with the district attorney's office and assisted with the investigation in this case. Sergeant Shelby said that she attempted unsuccessfully to locate Michael Pressley. She was able to locate and subpoena Tamika Jolly with much difficultly. Sergeant Shelby described Jolly's demeanor, when served with the subpoena, as "nervous. She was upset and she said she wasn't going to testify."

Sergeant Russell Maness with the Memphis Police Department testified that he worked in the Homicide Bureau in April 2006 and was involved in the investigation in this case. During the course of his investigation, Sergeant Maness took Michael Pressley to the Hickory Hill area of Memphis in an attempt to locate a Crowne Victoria believed to have been involved in the homicide. Sergeant Maness recalled that Pressley "was about crying scared," which led Sergeant Maness to place a bag with eye holes over Pressley's head to make him feel more comfortable.

Sergeant M. Oliver with the Memphis Police Department testified that he worked in the Homicide Bureau in April 2006 and was the case coordinator for the investigation in this case. During the course of the investigation, Sergeant Oliver spoke with Michael Pressley who was "real helpful" at first. However, toward the end of the investigation, Pressley "was scared [and] fearful for his life." Sergeant Oliver testified that after looking for the defendant for approximately two weeks, he finally reached the defendant by calling his cell phone. Sergeant Oliver told the defendant he needed to come to the police station or a warrant would be issued for his arrest, and the defendant complied.

Sergeant Oliver testified that he took a statement from the defendant, which was placed in a supplement, but the defendant did not give a formal typed statement. The defendant told Sergeant Oliver that he did not own a Crowne Victoria and denied riding in one. He said that "he knew nothing of [the victim's] death, he heard it through the grapevine." The defendant said he was not involved in the victim's murder and declined to talk further with the police. Sergeant Oliver stated that the defendant did not mention anything about the killing being in self-defense, and no information was revealed during the investigation that led him to believe the defendant was afraid of the victim.

Following the conclusion of the proof, the jury convicted the defendant as charged. The defendant appealed.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that the evidence supported an acquittal based on self-defense or, in the alternative, the evidence at best supported a verdict of voluntary manslaughter. When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). Facts from which the jury may infer

premeditation include the use of a deadly weapon on an unarmed victim; the lack of provocation on the part of the victim; the defendant's declarations of his intent to kill; the defendant's failure to render aid to the victim; the establishment of a motive for the killing; the particular cruelty of the killing; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

In the light most favorable to the State, the evidence shows that the defendant and two of his friends were driving around their neighborhood when he saw the victim in a passing car, became "fidgety," and immediately sought to arm himself. The defendant obtained a weapon from someone in the neighborhood, after which he acted "cool" and "normal." The defendant was dropped off by his friends at County Line Grocery, saying he was going to speak with the victim. The defendant walked around the back of the building, approached the victim's car from the passenger side, and shot the victim in the back four times from the rear passenger side of the car. The defendant ran off, was picked up by his friends, and admitted to his friends that he shot the victim. The group proceeded to another part of town to bury the gun in the defendant's grandmother's backyard. Based on this evidence, we conclude that a rational trier of fact could have found that the defendant killed the victim after the exercise of reflection and judgment.

The defendant questions the credibility of Athelia Frazier and Victoria Williams and each witness's respective ability to view various aspects of the incident. However, any questions concerning the testimony and the credibility of the witnesses were resolved by the jury as the trier of fact. The defendant also alleges that Dorrell Jones's testimony that the defendant told him the victim was reaching for something was supported by Dr. Chancellor's testimony regarding the locations of the victim's gunshot wounds as evidence of his theory of self-defense. Whether the defendant acted in self-defense is an issue for the jury to decide. State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). Again, the jury assessed the credibility of Jones's testimony and drew its own inferences from Dr. Chancellor's testimony. We will not substitute the jury's inferences drawn from the evidence for that of our own.

## II. Closing Argument

The defendant argues that the trial court abused its discretion in failing to grant a mistrial at three different points during the State's closing argument. He specifically argues that the State's closing argument was improper in that (1) the prosecutor commented that Michael Pressley and Tamika Jolly were in fear for their lives; (2) the prosecutor commented that the first time Dorrell Jones mentioned that the defendant said the victim was reaching for something was at trial; and (3) the prosecutor asked the defendant rhetorical questions.

Whether to declare a mistrial lies within the sound discretion of the trial court, and its decision in this regard will not be overturned on appeal absent a showing of an abuse of discretion.

State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id. (citing State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994)); State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999) (citing Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527 (citing State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996)).

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, they must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

## A. Fearful Witnesses

At trial, Sergeant Oliver testified that he spoke with Michael Pressley during the course of his investigation, and Pressley was "real helpful" at first but "was scared [and] fearful for his life" toward the end of the investigation. Sergeant Maness testified that he took Michael Pressley to the Hickory Hill area in an attempt to locate the Crowne Victoria, and Pressley "was about crying scared" so Sergeant Maness placed a bag with eye holes over Pressley's head to make him feel more comfortable. Sergeant Shelby testified that she attempted to locate Pressley and Tamika Jolly for trial. She was unable to locate Pressley, but she located and subpoenaed Jolly with much difficulty.

Sergeant Shelby stated that, when served with the subpoena, Jolly "seemed nervous. She was upset and she said she wasn't going to testify."

During its closing argument, the defense asserted that the defendant was afraid of the victim. At a sidebar conference, the State argued that there was no proof that the defendant feared the victim. The court ruled that the jury could infer fear from the proof. Then, in its rebuttal argument, the State suggested that the defendant was actually the one people feared as evidenced by Michael Pressley's actions. The defendant objected, arguing there was no proof that Pressley was afraid of the defendant. The court instructed the State, similarly to how it instructed the defense, to not draw its own conclusions but tell the jury that it could infer fear from the proof.

The court gave both parties latitude in arguing to the jury the various inferences it could draw from the evidence. The State's argument was in rebuttal to the defendant's assertions made in closing. Based on the testimony at trial, the jury could reasonably infer that Pressley was afraid of the defendant. With regard to Tamika Jolly, the defendant argues that the State's comment that "Tam[i]ka Jolly would rather go to jail than testify against this defendant" was not supported by the proof and was an unreasonable inference. We disagree. One of the reasonable inferences the jury could draw from Sergeant Shelby's testimony was that Tamika Jolly was afraid to testify against the defendant. A party "must be given the opportunity to argue not only the facts in the record but any reasonable inferences therefrom." Middlebrooks, 995 S.W.2d at 568 (citing Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)). Therefore, the trial court did not abuse its discretion in finding no manifest necessity for a mistrial.

## B. Dorrell Jones's Statement

During the State's direct examination of Dorrell Jones, Jones testified that the defendant admitted shooting the victim because the victim started to reach for something. Jones then testified that he gave two different statements to the police, with the second statement being more truthful and complete than the first. When asked whether he told the police in his statement that the defendant said the victim was reaching for something, Jones said, "Yes." However, when shown his second statement, Jones admitted that it did not contain any mention of the defendant's having said that the victim was reaching for something. Neither statement was admitted into evidence.

In his closing argument, defense counsel relied on Dorrell Jones's testimony that the defendant said he shot the victim because he was reaching for something. The prosecutor, then, in rebuttal, asserted that the first time Jones mentioned the victim reaching for something was at trial. On appeal, the defendant argues that the prosecutor misstated the evidence because "a fair reading of the . . . direct examination of Dorrell Jones shows that Mr. Jones told the police in his first statement that Defendant told him that the victim was reaching for a gun."

We discern no abuse of discretion in the trial court's finding no manifest necessity for a mistrial. Contrary to the defendant's assertion, the prosecutor did not misstate the evidence. Just as the jury could infer from the testimony that Jones must have mentioned the victim "reaching" in

his first statement, the jury could just as easily infer that whatever Jones said in his first statement was untruthful, or infer that Jones never mentioned the "reaching" until trial. Both parties were within the wide latitude granted in closing argument to argue the different inferences from this testimony.

## C. Rhetorical Questions

During rebuttal closing argument, the prosecutor said:

[The] [d]efense would have you believe that [the victim] was a dangerous and violent drug dealer. Not [the victim] though, is it, [the defendant]? Well, what about it? If you're in this line of work and your name is Little D and you're a small stature how do you make your way?

Defense counsel objected on grounds that the prosecutor asked the defendant a question when he could not answer. The court found that it was not improper to use rhetorical questions during closing argument and that the jury would not expect an answer. The court also noted that the prosecutor "didn't go up to [the defendant] and shake her finger in his face or wait for an answer, she just kept right on going." For the first time on appeal, the defendant asserts that the prosecutor's use of these rhetorical questions served to inflame the jury.

Upon review, we note that the prosecutor was rebutting the defendant's assertion that the victim was a feared man in the community by use of rhetorical questions, which are really no more than statements. As noted by the court, the prosecutor did not shake her finger at the defendant or make any sort of accusatory gestures toward him that could have made the rhetorical questions inflammatory in nature. Given the nature of closing argument and the wide latitude granted the parties in making their arguments, we cannot conclude that the prosecutor's use of these rhetorical questions served to inflame the passions or prejudices of the jury.

## III. Post-Arrest Silence

The defendant lastly asks this court to recognize as plain error[3] Sergeant Oliver's testimony that the defendant had never told him "in the last two years that this had something to do with self-defense." He asserts that such testimony was an impermissible comment regarding his silence post-arrest.

The doctrine of plain error provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right

---

[3] The defendant failed to raise the issue in his motion for new trial. <u>See</u> Tenn. R. App. P. 3(e).

of the defendant. Tenn. R. Crim. P. 36(b).[4] In order for us to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The error must have been "'of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)). A court's discretion to notice plain error is to be "sparingly exercised." State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007). Consideration of all five factors is unnecessary when it is clear from the record that at least one of them cannot be satisfied. Id. at 355.

Prior to Sergeant Oliver's testimony, a bench conference was held in which the parties discussed the defendant's motion to suppress his statement to Sergeant Oliver that he had nothing to do with the homicide. Apparently, the motion was not argued earlier because the State did not think the defendant's statement was relevant. However, the State determined that the statement was relevant and wanted to have the issue heard. The defense responded that the State had agreed not to use the statement unless the defendant chose to testify and said that "[a]t this point it is our intention that [the defendant] is going to testify, and rather than have [Sergeant] Oliver have to come back for rebuttal testimony we don't have any problem with having the State ask that."

The trial court cautioned that it would be better for the parties to know whether the defendant's statement would be admissible before the defendant testified. The defense responded that it did not have any objection to the statement coming in because "it could be used for rebuttal anyway, and [the defendant] is going to testify." The court again cautioned that the defendant had a constitutional right to change his mind and not testify, but the defense said it was withdrawing the motion to suppress.

At trial, Sergeant Oliver testified that he questioned the defendant, and the defendant denied any involvement in the victim's murder. Sergeant Oliver said that the defendant denied owning a Crowne Victoria or riding in one. Sergeant Oliver recalled that the defendant stated "that he knew nothing of [the victim's] death, he heard it through the grapevine." Sergeant Oliver said that the defendant did not want to talk about the matter any further. When asked if the defendant had told Sergeant Oliver in the last two years that the shooting had something to do with self-defense, Sergeant Oliver said, "No, ma'am." The defendant objected, and the court noted that "[i]f the defendant were to testify and say that it was self-defense then you question the defendant about whether or not he told anyone after he had testified but not yet." The court immediately gave the jury a curative instruction that it could not consider that the defendant "just decided not to call the police and say something against [himself]."

[4] Effective July 1, 2009, Rule 52(b) of the Tennessee Rules of Criminal Procedure was deleted, and the plain error language was added to Rule 36(b) of the Tennessee Rules of Appellate Procedure. See Tenn. R. App. P. 36(b) and Tenn. R. Crim. P. 52, Advisory Comm'n Cmts. (2009).

In discussing the jury charge with the parties, the court addressed the issue that the State had asked Sergeant Oliver whether the defendant had voluntarily called the police sometime between his initial statement and trial to say the shooting was in self-defense. The court recalled the history of cases that discussed whether a defendant's post-arrest silence could be commented on, ending with Fletcher v. Weir, 455 U.S. 603, 607, 102 S. Ct. 1309, 1312 (1982), which allowed cross-examination as to post-arrest, pre-Miranda, silence when a defendant chooses to testify, and two unreported Tennessee cases discussing Weir.[5] The court noted that this issue arose because the parties were trying to prevent the officer from having to testify again later, but when the defendant changed his mind about testifying, it meant that the officer's testimony was no longer appropriate impeachment testimony. Therefore, the jury needed an additional instruction.

In its charge to the jury prior to closing argument, the trial court emphasized, using language the defendant concurred with, that:

> You also may not consider the fact if you so find proven that the defendant didn't call the police and ma[k]e statements regarding his case after making his initial statement to the police. His election not to initiate further contact with the police regarding the investigation of his case can't be considered for any purpose against him, nor can you draw any inference from that as well.

We decline to recognize plain error in this case because doing so is not necessary to do substantial justice. Here, the questioned testimony was brief and isolated, the trial court immediately gave the jury a curative instruction, and the court gave the jury a very thorough limiting instruction in its charge. Moreover, the evidence of premeditation was strong, consisting of, in the light most favorable to the State, the defendant's use of a deadly weapon on an unarmed victim, the lack of provocation on the part of the victim, the defendant's procurement of a weapon, and secretion of evidence after the killing. Whereas, the defense theory of self-defense was not impugned solely by the defendant's silence on the subject, but primarily by his denying any involvement to Sergeant Oliver and the questioned credibility of Dorrell Jones's testimony. The defendant is not entitled to plain error relief.

---

[5] State v. Jonathan D. Rosenbalm, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *5 (Tenn. Crim. App. Dec. 9, 2002), perm. to appeal denied (Tenn. May 27, 2003); State v. Chris Haire, No. E2000-01636-CCA-R3-CD, 2002 WL 83604, at *14-15 (Tenn. Crim. App. Jan. 22, 2002), perm. to appeal denied (Tenn. June 24, 2002).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE